## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ronnie Jackson,

                    Plaintiff,

v.

Vicki Hereford, Jeffrey White,
Michelle Saari, Donn Weber,
Jeff Gutzmer, Bradley Pluff,
Kelly McElroy, David Rieshus,
and Kent Grandlienard,

                    Defendants.

Civ. No. 14-2982 (JRT/BRT)

**REPORT AND
RECOMMENDATION**

Ronnie Jackson, OID #239471, MCF-Oak Park Heights, 5329 Osgood Ave. N.,
Stillwater, MN 55082, *pro se* Plaintiff.

Lindsay Strauss, Esq., Minnesota Attorney General's Office, counsel for Defendants.

BECKY R. THORSON, United States Magistrate Judge.

## INTRODUCTION

Ronnie Jackson has filed a federal civil rights action against nine current and
former employees of the Minnesota Correctional Facility at Oak Park Heights, alleging
that his rights under the Eighth Amendment and substantive due process were violated
when, on May 13, 2014, he was denied adequate medical care, was unnecessarily
strapped to a restraint board for three-and-a-half hours without access to a bathroom, and,
after he urinated on himself, was denied a shower for two days. (Doc. No. 1, Compl.) In
particular, Jackson claims that: (1) Nurse Vicki Hereford acted with deliberate

indifference to his serious medical needs, in violation of the Eighth Amendment;

(2) Sergeant Donn Weber ordered the use of the restraint board without need or

provocation, in violation of the Fifth, Eighth, and Fourteenth Amendments;

(3) Lieutenant Jeffrey Gutzmer authorized his placement on the restraint board and

deprived him of access to a shower, in violation of the Fifth, Eighth, and Fourteenth

Amendments; (4) prison psychologist Michelle Saari and Lieutenant Jeffrey White failed

to intervene to prevent the allegedly unconstitutional use of the restraint board;

(5) Officer Kelly McElroy denied him access to the bathroom while he was restrained, in

violation of the Eighth Amendment; (6) Sergeant Bradley Pluff likewise violated the

Eighth Amendment by failing to intervene to allow him to use the bathroom and

depriving him of a shower for two days; (7) Associate Warden of Operations David

Reishus failed to properly train prison staff in the use of restraints; and (8) Warden Kent

Grandlienard contributed to the claimed constitutional violations by rejecting his

grievances and failing to implement "a descriptive definition of self-injurious behavior,"

rules for "basic hygiene for prisoners left in bodily waste," and rules allowing restrained

prisoners to use the bathroom. (*Id.* ¶¶ 60–68.)

Jackson has sued each defendant in his or her individual capacity and sued

Grandlienard in his official capacity as well. (*Id.* at 1.) He requests $1 million in

compensatory and punitive damages from each defendant, for a total of $9 million, and

an injunction requiring Grandlienard to "write a descriptive definition of self-injurious

behavior" and implement rules allowing restrained inmates to use the bathroom and

shower to remove any bodily waste. (*Id.* at 20 & Attach. 1 at 1–3.)

The defendants have moved for summary judgment on myriad grounds, including that Jackson has not demonstrated a constitutional violation and, even if he had, that they are otherwise entitled to qualified immunity because their actions did not contravene his clearly established constitutional rights. (*See* Doc. No. 80, Defs.' Mot. for Summ. J.; Doc. No. 81, Defs.' Mem. in Supp. of Mot. for Summ. J.; Doc. No. 146, Defs.' Reply.) For the reasons stated below, this Court recommends that the defendants' motion for summary judgment be granted in its entirety as to each of Jackson's constitutional claims.

## BACKGROUND

### I.  Jackson's Psychiatric and Disciplinary History

Convicted of arson, Jackson was first committed to the Minnesota Correctional Facility at St. Cloud ("MCF-SCL") on November 29, 2012.[1] (Doc. No. 92, Aff. of Tammy Wherley ("Wherley Aff.") ¶ 2 & Ex. 1.) At the time of his incarceration, Jackson had a long history of self-injurious behavior, mood swings, and dissociative episodes marked by violent outbursts, which included stabbing a school principal with a pair of scissors, striking his fiancé with a bottle, and over two dozen suicide attempts. (Doc. No. 86, Aff. of Dr. David Paulson ("Paulson Aff."), Ex. 7 at 1–5.) During his initial psychiatric assessment at MCF-SCL, Jackson described daily suicidal thoughts, auditory

---

[1]      For purposes of summary judgment, the facts are drawn from the evidence viewed in the light most favorable to Jackson. *See Edwards v. Boyd*, 750 F.3d 728, 731 (8th Cir. 2014). The facts are not based on allegations that lack evidentiary support, *see Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 421 (8th Cir. 2011), conclusory assertions, *see Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003), or sworn statements that are "blatantly contradicted" by objective evidence in the record, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

hallucinations exhorting him to harm himself and others, and episodes of severe anxiety resulting in chest pains and shortness of breath. (*Id.* at 1.) He was diagnosed with depression and borderline personality disorder ("BPD"), and prescribed Depakote and Zoloft. (*Id.* at 2–3, 5.)

Within a week of his arrival at MCF-SCL, Jackson was disciplined for nine rule violations, including threatening others, assaulting prison staff, disorderly conduct, disobeying a direct order, and possessing a weapon. (Wherley Aff., Ex. 3 at 2; *see also id.*, Ex. 2, Offender Discipline Rules at 5, 9, 11, 13.) On one of those occasions, Jackson reported that voices in his head were urging him to slit his cellmate's throat. (*See* Wherley Aff. ¶ 4; Doc. No. 135, Pl.'s Decl. in Opp'n to Summ. J. 3; Doc. No. 140, Addendum to Pl.'s Decl. ¶ 5.) Due to his conduct, Jackson was transferred to the Minnesota Correctional Facility at Oak Park Heights ("MCF-OPH") on December 7, 2012, placed on disciplinary segregation status, and assigned to its Administrative Control Unit ("ACU"), which is typically reserved for inmates who pose a serious threat to themselves, others, or to the orderly operation of the prison. (*See* Wherley Aff. ¶¶ 3–4; Doc. No. 88, Aff. of David Reishus ("Reishus Aff.") ¶¶ 5–6 & Ex. 1 at 1; Doc. No. 84, Aff. of Jeffrey Gutzmer ("Gutzmer Aff.") ¶ 5.) Because inmates on disciplinary segregation status are deemed to present a heightened security risk, they are ordinarily confined to their cells for twenty-three hours per day and may possess only limited personal property, including clothing, bedding, and personal hygiene items such as toilet paper, soap or shampoo, deodorant, a toothbrush and toothpaste, and towels. (*See* Reishus Aff. ¶¶ 7–9, Ex. 2 at 4–5, & Ex. 3 at 16.) Inmates housed in the ACU can receive medical

4

attention by submitting a written "kite" to sign up for sick call or, if there is a potentially life-threatening emergency, by pressing the duress buttons in their cells. (*See* Reishus Aff., Ex. 3 at 7; Paulson Aff. ¶ 5; Gutzmer Aff. ¶ 19.)

Between March and November 2013, Jackson was repeatedly sent back to the ACU based on several incidents that resulted in convictions for twenty-two rule violations, including six counts of assaulting prison staff, five counts of disorderly conduct, four counts of engaging in threatening behavior, one count of misusing prescription medication, and two counts each of disobeying a direct order, abuse or harassment, and destruction of prison property.[2] (*See* Wherley Aff. ¶¶ 5–9 & Exs. 4–6.) During one of the underlying incidents, Jackson disobeyed an order to return to his cell, kicked one of the responding officers in the thigh, and threatened staff by stating "whoever put[s] hands on me is going to die." (Wherley Aff., Ex. 4.) During a second incident, Jackson apparently swallowed a razor blade and sixty pills, covered his cell camera with plastic lining torn from his mattress, and refused directives to come to his cell door. (Wherley Aff., Ex. 5; Pl.'s Decl. 3–4.) And during a third, Jackson spit in officers' faces, actively resisted as they tried to place him back in his cell, and attempted to bite an officer's hand while he was restrained. (Wherley Aff., Ex. 6.)

---

[2]     The use of disciplinary segregation (*i.e.*, solitary confinement), particularly for prisoners like Jackson who have been diagnosed with a mental illness, is not at issue in this case, though it has garnered heightened attention in recent years by the public and the legal community alike. *See, e.g.*, *Davis v. Ayala*, — U.S. —, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring); *Glossip v. Gross*, — U.S. —, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting); Barak Obama, Opinion, *Why We Must Rethink Solitary Confinement*, Wash. Post, Jan. 25, 2016.

Around the same time period, in October 2013, Jackson was diagnosed with hypertension and his psychiatric medications were replaced with Effexor—used for treating depression, anxiety, and panic attacks—after he expressed continued sadness and daily suicidal thoughts. (Paulson Aff. ¶¶ 10–11, Ex. 6 at 2, & Ex. 7 at 12–13.) Possible side effects of Effexor include headaches, sweating, high blood pressure, chills, dry mouth, nausea, vomiting, and shaking. (*See* Paulson Aff. ¶ 12; Doc. No. 137, Pl.'s Ex. 12.) Rare and less common side effects include chest pains, lightheadedness or fainting, difficulty breathing, and "shaking that is hard to control." (*See* Paulson Aff. ¶ 12; Pl.'s Ex. 12.) For the next five months, Jackson did not report any side effects of Effexor and his blood pressure readings remained, with a few exceptions, within normal limits. (*See* Paulson Aff. ¶¶ 10, 12 & Ex. 7 at 15.)

## II.  The Events of May 13, 2014

The events underlying Jackson's lawsuit took place on Tuesday, May 13, 2014, while ACU inmates were temporarily housed in a less secure unit, Complex 5, due to construction. (*See* Gutzmer Aff. ¶ 6.) Jackson states that he began experiencing severe chest pains, nausea, shortness of breath, and other symptoms around noon. (Pl.'s Decl. ¶¶ 8, 11; *see also* Doc. No. 137, Pl.'s Ex. 14, Decl. of Jerrell Brown ("Brown Decl.") ¶ 3.) He now attributes those symptoms to side effects of Effexor. Jackson repeatedly tried to get medical attention over the next hour and a half, notifying a passing guard about his symptoms and then pushing his emergency duress button on three successive occasions. (Pl.'s Decl. ¶¶ 8–12.) Although some of those requests were relayed to health services, for reasons unknown they were not immediately responded to by medical staff.

(*See id.* ¶¶ 10–11; Gutzmer Aff. ¶ 20; Doc. No. 91, Aff. of Donn Weber ("Weber Aff.") ¶ 21.)

Jackson states that, shortly after 1:30 p.m., he fainted to the floor of his cell and, when he came to several minutes later, crawled towards his toilet and vomited. (Pl.'s Decl. ¶ 13.) He then hoisted himself onto the toilet and grabbed a "grease container"[3] from his sink, which he used to knock on his cell door for several minutes in an effort to obtain medical attention. (*Id.* ¶¶ 13–14.) Three of his neighboring inmates soon added to the commotion, kicking their own cell doors in solidarity with Jackson. (*See id.* ¶ 14; Brown Decl. ¶¶ 4, 6; Doc. No. 137, Decl. of Manuel Najera ("Najera Decl.") 3.) The commotion continued for several more minutes until Sergeant Donn Weber heard what he believed to be kicking and pounding on a cell door, headed towards Jackson's cell, and saw Jackson yelling and hitting his door. (*See* Pl.'s Decl. ¶ 15; Doc. No. 90, Ex. 1, Pl.'s Depo. 68; Weber Aff. ¶ 5; Doc. No. 82, Aff. of Steven Ayers ("Ayers Aff."), Ex. 1.) Viewing Jackson's behavior as loud, threatening, angry, and "out of control," and based on his experience working at MCF-OPH, Sergeant Weber thought that it was possible that Jackson might "start to bash his head into his cell door or hurt himself in some other way." (Weber Aff. ¶¶ 6–7, 11, 17.) Weber therefore activated the prison's Incident Command System, requesting an emergency response for a self-injurious inmate. (Pl.'s Decl. ¶ 15; Weber Aff. ¶ 6; Gutzmer Aff. ¶ 7.) Self-injurious behavior includes any

---

[3]     It is unclear what type of grease container Jackson used or why he had it in his cell, as the personal items that ACU inmates are permitted to keep in their cells do not appear to include any type of grease container. (*See* Reishus Aff., Ex. 3 at 3, 16.)

conduct that could cause illness, injury, or bodily harm to an inmate. (*See* Weber Aff. ¶ 7; Gutzmer Aff. ¶ 10.)

The A-Team, a specially trained emergency response unit, arrived at Jackson's cell along with Lieutenant Jeffrey Gutzmer, the second-shift supervisor for the ACU. (*See* Pl.'s Decl. ¶ 16; Weber Aff. ¶¶ 6, 12; Gutzmer Aff. ¶¶ 4, 7; Reishus Aff. ¶ 12.) Sergeant Weber informed Gutzmer that Jackson had been kicking his cell door, hitting his cell window, and ignoring directives to stop, and Gutzmer himself observed Jackson hitting his cell door and yelling.[4] (*See* Gutzmer Aff. ¶¶ 8–9; Weber Aff. ¶ 13.) Based on Weber's report, his own observations, and his past experience with inmates who had broken bones while kicking or punching their cell doors, Gutzmer concluded that Jackson was self-injurious and ordered that he be placed on a restraint board, a type of total body restraint also known as a pinion restraint. (*See* Gutzmer Aff. ¶¶ 10–13, 33; Weber Aff. ¶ 16; Ayers

---

[4]     The defendants' accounts of Jackson's behavior differ sharply from Jackson's own account. While Jackson asserts in his declaration and deposition that he repeatedly knocked on his cell door with a grease container and "kind of yelled out," Sergeant Weber and Lieutenant Gutzmer assert that they observed Jackson kicking and punching his cell door and yelling. (*See* Pl.'s Decl. ¶ 13; Pl.'s Depo. 68; Gutzmer Aff. ¶¶ 9, 11; Weber Aff. ¶¶ 5, 13.) In the incident report that he drafted on the afternoon of May 13, 2014, Weber likewise stated that he "heard the distinct sound of someone pounding and/or kicking their cell door" and then saw Jackson "screaming and yelling incoherently as he punched and/or kicked the cell door." (Ayers Aff., Ex. 1.) On summary judgment, this Court must accept Jackson's version of the events where it contradicts the defendants' version, provided that Jackson's version finds some evidentiary support in the record. This Court must therefore assume for present purposes that Jackson was hitting his cell door with a grease container, rather than with his hands and feet. But, as explained later, just because Jackson may have been using a grease container instead of his hands and feet does not necessarily mean that Weber and Gutzmer did not subjectively believe that he was punching and kicking his cell door, particularly given the undisputed banging sounds that Sergeant Weber heard and the information that Weber conveyed to Gutzmer.

Aff., Ex. 2 & Ex. 12 at 2.) Fearing that Jackson might continue to engage in potentially self-injurious behavior if he was not restrained, Gutzmer "decided to err on the side of safety" by authorizing the use of the restraint board. (Gutzmer Aff. ¶ 33.)

Department of Corrections' ("DOC") policies do not allow for the use of restraints as punishment; instead, they permit a unit supervisor or watch commander to authorize an inmate's placement on a restraint board whenever it is both reasonable and necessary to maintain order and security, enforce facility rules, protect property, or prevent an inmate from injuring himself or others. (*See* Ayers Aff. ¶¶ 9, 18 & Ex. 12, DOC Policy 301.081(A)(1)–(2), (B)(2)(a)–(b); Gutzmer Aff. ¶¶ 29, 32.) An inmate must receive medical clearance before being placed on the board, must be evaluated by a mental health professional sometime afterwards "to determine if continued restraint is appropriate" and whether the inmate should be placed on Continuing Observation Status ("COS") once removed, and his condition and behavior while on the board must be logged every fifteen minutes. (*See* Ayers Aff. ¶ 13 & Ex. 12, DOC Policy 301.081(B)(2)(d)–(f); Doc. No. 89, Aff. of Michelle Saari ("Saari Aff.") ¶¶ 6–7.) Prison staff must also check on the inmate every thirty minutes to ensure that the restraints are not causing injury, determine whether the inmate will comply with staff directives and refrain from "destructive, assaultive, or injurious acts," and allow the inmate to use the restroom if it can be accomplished "in a manner that maintains the safety of the staff and the offender." (*See* Ayers Aff. ¶¶ 15, 27 & Ex. 12, DOC Policy 301.081(B)(2)(g).) Since an inmate must be removed from the restraint board one limb at a time, either the inmate or an officer may be injured if there are not enough staff members present to remove the inmate so that he may use the

bathroom. (*See* Doc. No. 87, Aff. of Bradley Pluff ("Pluff Aff.") ¶ 11; Ayers Aff. ¶ 27.)

A unit supervisor or watch commander may authorize an inmate's removal from the

restraint board when the inmate has shown a willingness to follow staff directives and

refrain from disruptive or self-injurious behavior, but absent exceptional circumstances,

the use of such restraints may not exceed four hours. (*See* Ayers Aff. ¶¶ 15, 17 & Ex. 12,

DOC Policy 301.081(B)(2)(h).)

After Gutzmer ordered the use of a restraint board, members of the A-Team

removed Jackson from his cell in handcuffs, leg irons, and a waist chain and escorted him

to a nearby table for examination by nurses Vicki Hereford and Emily Mellingen. (*See*

Gutzmer Aff. ¶¶ 13–16; Weber Aff. ¶ 14; Ayers Aff. ¶¶ 15–16; Wherley Aff., Ex. 7; Pl.'s

Decl. ¶ 17.) Per DOC policy, Jackson's extraction from his cell, medical evaluation, and

initial placement on the restraint board were all videotaped. (*See* Wherley Aff. ¶ 10 &

Ex. 7; Ayers Aff., Ex. 12, DOC Policy 301.081(C)(2)(c).) Jackson complied with the

officers' instructions, offered no resistance, and remained calm both during and after his

medical examination, though he was handcuffed, shackled, and physically restrained by

correctional officers the whole time. (*See* Pl.'s Decl. ¶¶ 16, 25; Wherley Aff. ¶¶ 11-12 &

Ex. 7; Ayers Aff. ¶ 14 & Ex. 1 at 2.)

When asked about his symptoms, Jackson told Nurse Hereford that he had

experienced chest pains, had been "spitting up . . . a thick-type foam," had been

lightheaded and short of breath, and had been "hitting [his cell] door to get [medical]

attention." (Wherley Aff., Ex. 7; *see also* Doc. No. 85, Aff. of Vicki Hereford ("Hereford

Aff.") ¶ 12.) Jackson did not state that he had vomited or fainted, nor did he mention that

he thought he was suffering side effects from Effexor. (*See* Wherley Aff., Ex. 7; Hereford Aff. ¶¶ 12–13.) Hereford and Mellingen took Jackson's vital signs and determined that his pulse (100 beats per minute), blood pressure (150/80), oxygen saturation level (96%), and respiration rate (18 breaths per minute) were all within normal limits.[5] (Hereford Aff. ¶ 13; Paulson Aff. ¶¶ 14–15 & Ex. 5 at 11.) Although Hereford noted that Jackson was "kind of shaky," his skin was warm and dry, he was calm and able to speak in full sentences, and he was breathing normally.[6] (*See* Hereford Aff. ¶¶ 13–16; Paulson Aff., Ex. 5 at 11; Wherley Aff., Ex. 7; Pl.'s Decl. ¶ 20.) Given Jackson's vital signs, warm and dry skin, and the lack of any indication of medical distress, Hereford concluded that Jackson was not suffering from a serious medical need requiring further evaluation or treatment by a doctor, that his reported symptoms may have been brought on by anxiety, and that placing him on the restraint board would not cause him any harm. (Hereford Aff. ¶¶ 13–18.) She therefore medically cleared Jackson to be placed on the restraint board,

---

[5]     In his declaration, Jackson maintains both that he informed Nurse Hereford that he had fainted and that she never measured his oxygen saturation level. (Pl.'s Decl. ¶¶ 18–19.) Both assertions are flatly contradicted by the objective evidence in the record, particularly the videotape of Jackson's medical evaluation. In that recording, Jackson never mentions fainting to Nurse Hereford. The video also shows Hereford specifically commenting on Jackson's oxygen saturation level, which she specifically logged in his medical records as 96%. (*See* Wherley Aff., Ex. 7; Paulson Aff., Ex. 5 at 11.)

[6]     Jerrell Brown, a fellow inmate, states in his declaration that Jackson was suffering from "severe tremors" when he was examined by Hereford. (Brown Decl. ¶ 8.) It is unclear, however, how Brown knows this and, in any event, his assertion is not supported by the videotape of Jackson's medical evaluation. While the video documents Hereford stating that Jackson was "kind of shaky," it does not depict any severe or otherwise noticeable tremors.

though she informed him that she would continue to monitor his condition. (*See id.* ¶ 18; Wherley Aff., Ex. 7; Gutzmer Aff. ¶ 17.)

At approximately 2:00 p.m. Jackson was placed face down on a restraint board by four correctional officers. (*See* Wherley Aff. ¶ 14 & Ex. 7; Gutzmer Aff. ¶ 24; Pl.'s Decl. ¶ 25.) His hands, feet, torso, and head were strapped to the board and he was stripped of his pants and socks, leaving him in his underwear. (*See* Wherley Aff., Ex. 7; Pl.'s Decl. ¶¶ 26–27.) According to Associate Warden Tammy Wherley, removing an inmate's clothing before placement on a restraint board is standard practice at MCF-OPH because it allows correctional staff to better "determine whether the offender's restraints fit properly" and also prevents a restrained inmate's clothing from chaffing against his skin. (Doc. No. 147, Second Aff. of Tammy Wherley ("Second Wherley Aff.") ¶¶ 2–3.) Once Jackson was secured to the restraint board, Hereford and Mellingen checked his restraints and Officer Doug Witte notified him that he would be checked on every half hour to determine whether he would "stop his out of control, self-injurious behavior" and offered a bathroom break at that time. (Wherley Aff. ¶ 15 & Ex. 7; Hereford Aff. ¶ 19; Gutzmer Aff. ¶ 23; Weber Aff. ¶ 19; Pl.'s Decl. ¶ 27.) Hereford then drafted a progress note regarding her evaluation of Jackson, reviewed his medical file, and did not see anything in the file that caused her any concern about his health. (Hereford Aff. ¶¶ 21–22.)

Per DOC policies, prison staff checked on Jackson every thirty minutes and asked whether he would comply with staff directives. (*See* Ayers Aff. ¶ 16 & Ex. 11.) During his time on the restraint board, Jackson repeatedly removed his head strap and was yelling, both of which suggested to the officers that he was unwilling to control his

12

behavior and comply with staff directives. (*See* Ayers Aff. ¶ 16 & Ex. 11; Gutzmer Aff. ¶ 35; Pluff Aff. ¶ 7; Doc. No. 93, Aff. of Jeffrey White ("White Aff.") ¶ 9.) Jackson was also periodically evaluated by nursing staff. Although he claims that his medical symptoms both continued and intensified while he was on the restraint board, he denied having chest pains to nursing staff, did not complain of any shortness of breath, and was speaking normally. (*See* Pl.'s Decl. ¶¶ 24, 26; Hereford Aff. ¶ 25; Paulson Aff. ¶ 17 & Ex. 5 at 11–12.)

In the meantime, prison psychologist Michelle Saari came to evaluate Jackson's mental condition around 2:30 p.m. (Saari Aff. ¶¶ 4–8; Pl.'s Decl. ¶ 28.) During her evaluation, Jackson was calm, polite, able to breathe, and not in any apparent pain or distress. (Saari Aff. ¶ 9 & Ex. 1; *see also* Ayers Aff., Ex. 9.) He told Saari that he had no intention of hurting himself or others and that he only "began kicking his door" because he was frustrated with prison staff for ignoring his complaints of chest pain. (Saari Aff. ¶ 9 & Ex. 1; *see also* Ayers Aff., Ex. 9.) Saari determined that "Jackson was not self-injurious at that time because he was calm, complying with staff directives, answered [her] questions, and nothing else indicated that he would harm himself." (Saari Aff. ¶ 10.) She notified security staff of her findings and drafted a report regarding her mental health assessment, which concluded that "COS placement [was] not warranted" because Jackson's "demeanor was calm, cooperative, and appropriate" throughout her assessment. (*See* Saari Aff. ¶¶ 10–11; Ayers Aff., Ex. 9.) As a mental health professional, Saari did not have the authority to order Jackson's removal from the restraint board; her role was

limited to evaluating Jackson and sharing her assessment with security officers. (Saari Aff. ¶¶ 12–14.)

Saari forwarded her report to the third-shift watch commander, Lieutenant Jeffrey White, at around 3:00 p.m.[7] (*See* Saari Aff. ¶ 11; White Aff. ¶ 7; Ayers Aff., Ex. 9.) Lieutenant White reviewed the report and, despite its findings, decided to keep Jackson on the restraint board at that time because "he was exhibiting negative and out of control behavior" by repeatedly removing his head strap and yelling, actions which suggested to White that Jackson was not yet "calm" and "willing to comply with staff directives." (White Aff. ¶¶ 7, 9.)

At 3:45 p.m., nearly two hours after he had been placed on the restraint board, Jackson asked Officer Luke Hobbs to use the bathroom. (Pl.'s Decl. ¶¶ 30, 32; Pluff Aff. ¶ 10; *see also* Ayers Aff., Ex. 11.) Additional staff were called to help remove Jackson from the restraint board, but because not enough staff were then available, Hobbs asked Jackson whether he would be able to wait until the next security check. (*See* Pl.'s Decl. ¶ 30; Pluff Aff. ¶ 10.) Jackson replied, "yes." (Pl.'s Decl. ¶ 30.) During the next security check, which occurred at 4:10 p.m., Jackson renewed his request to use the bathroom to Officer Kelly McElroy. (*See id.* ¶ 31; Pl.'s Depo. 91; Ayers Aff., Ex. 11.) According to Jackson, McElroy replied, "no, if I let you off the board to use the bathroom your time will start over because that constitutes negative behavior." (Pl.'s Decl. ¶ 31; *see also*

---

[7]     Before his shift ended at 3:00 p.m., Lieutenant Gutzmer informed White, the incoming watch commander, that Jackson had been placed on the restraint board for self-injurious behavior. (*See* Gutzmer Aff. ¶¶ 4, 26–28; White Aff. ¶¶ 4–5.)

Brown Decl. ¶ 10.) Unable to use the bathroom, Jackson urinated on himself at approximately 4:25 p.m. (Pl.'s Decl. ¶ 32.) The urine spread down to his feet and up to his head, prompting Jackson to remove his head strap. (*Id.* ¶¶ 32–33.) At the next security check, which occurred at 4:50 p.m., prison staff noticed that Jackson had urinated on himself and removed his head strap. (*Id.* ¶ 33; Ayers Aff., Ex. 11.) They replaced the urine-soaked towel nestled beneath his head with a clean one, refastened the head strap, and left. (Pl.'s Decl. ¶ 33.) The urine, however, quickly spread back to Jackson's head. (*Id.*)

At 5:25 p.m., following one final security check, Lieutenant White authorized Jackson's removal from the restraint board after Jackson indicated that he was willing to comply with staff directives and prison rules. (*See* White Aff. ¶ 11; Pluff Aff. ¶ 12; Pl.'s Decl. ¶ 34; Doc. No. 138, Pl.'s Ex. 33.) Sergeant Bradley Pluff helped remove Jackson from the restraint board and escorted him back to his cell. (*See* Pluff Aff. ¶¶ 12–13; Pl.'s Decl. ¶ 34.) Before his shift ended earlier that day, Lieutenant Gutzmer had ordered that Jackson be placed on quiet status following his eventual removal from the board, as was standard practice. (*See* Gutzmer Aff. ¶¶ 25, 28; White Aff. ¶ 12.) Inmates on quiet status are allowed to shower during scheduled exercise periods on Sunday, Tuesday, and Thursday, though they typically have access to soap, towels, and running water and can therefore take "birdbaths" in their cells. (*See* Gutzmer Aff. ¶¶ 25, 39; White Aff. ¶ 12; Pluff Aff. ¶ 15.)

Once he was back in his cell, Jackson asked Sergeant Pluff if he could take a shower to wash the urine off of himself. (*See* Pl.'s Decl. ¶ 39; Pl.'s Depo. 94; Pluff Aff.

¶ 15.) Because the ACU "was running behind schedule" and Jackson was on quiet status, Pluff said no, but provided Jackson with clean clothes and fresh towels so that he could take a birdbath in his sink. (*See* Pl.'s Decl. ¶¶ 38–39; Pl.'s Depo. 94–95; Pluff Aff. ¶ 15.) Although Jackson was not given any soap, he had access to both running water and shampoo in his cell. (*See* Pl.'s Decl. ¶ 38; Pl.'s Depo. 95.) Jackson declined to wash up in his cell; instead, he repeatedly asked to take a shower over the next two days, only to be told "next shift" or "not today." (*See* Pl.'s Decl. ¶ 40; Pl.'s Depo. 95.) As a result of being covered in urine for two days, Jackson felt humiliated, degraded, and nauseous, suffered severe itching, and had difficulty eating and drinking due to the smell. (Pl.'s Decl. ¶ 41.) Jackson was finally allowed to take a shower on Thursday, May 15, 2014. (*See* Pl.'s Decl. ¶ 40; Pl.'s Depo. 98.)

## III.  The Aftermath of Jackson's Restraint Board Placement

Following the use of the restraint board, all correctional officials involved in the events of May 13, 2014, including Sergeant Weber, Lieutenant Gutzmer, Nurse Hereford, and members of the A-Team, completed incident reports in accordance with DOC policy. (*See* Ayers Aff. ¶ 5, Exs. 1–10 & Ex. 12, DOC Policy 301.081(C)(2)(a).) Weber's report indicated that Jackson had been punching and kicking his cell door, yelling incoherently, and shouting obscenities and insults. (Ayers Aff., Exs. 1–2.) Officer Witte's report likewise stated that members of the A-Team had been "briefed that [Jackson] was kicking and hitting his cell door," and Gutzmer's report added that Jackson had "refused multiple directives to cease kicking and punching his cell door" before the decision was made to place him on the restraint board. (Ayers Aff., Exs. 2–3.) Captain Steven Ayers conducted

16

a use-of-force review based on those incident reports, the restraint board log, and the available video footage, and concluded that prison staff acted appropriately because Jackson had engaged in self-injurious or out-of-control behavior by repeatedly pounding on his cell door. (Ayers Aff. ¶¶ 5–7, 10–11 & Ex. 13.) While Ayers noted that Jackson appeared calm both during and after his medical evaluation, Ayers believed that it was possible that Jackson would have continued his negative behavior if returned to his cell, particularly given that he had been "restrained the entire time he was being evaluated" and therefore "unable to act out in any way." (*Id.* ¶ 14.) Warden Kent Grandlienard reviewed and signed off on Captain Ayers' use-of-force review. (*Id.* ¶ 19.)

Jackson later filed a succession of kites with Lieutenant Gutzmer, Captain Ayers, Assistant Warden of Operations David Reishus, and Warden Grandlienard complaining about the use of the restraint board. (*See* Wherley Aff., Ex. 8 at 7–11.) Gutzmer responded that the board placement was appropriate because Jackson had been hitting and kicking his cell door, and nursing staff had confirmed that he was not experiencing a medical emergency at the time. (*Id.* at 10–11.) Ayers concurred with Gutzmer's assessment based on the incident reports and video recording, and Grandlienard responded that Jackson's concerns had been "thoroughly reviewed and responded to." (*Id.* at 7.) Grandlienard added: "If you think being disruptive (as you admit to) is a way to get what you want, clearly that did not work out well for you . . . . Hopefully, you will not put yourself in this situation again." (*Id.* at 7.) Jackson then filed a formal grievance concerning the events of May 13, 2014. (*Id.* at 6.) Warden Grandlienard dismissed the grievance, finding that the use of the restraint board was "appropriate per policy" because

17

Jackson "began kicking and hitting [his] door which is considered self-injurious behavior." (*Id.* at 5.) Jackson appealed that decision to the DOC's Central Office, which, following an investigation, found that Jackson had been "treated appropriately in this situation." (*Id.* at 1, 3.)

Before Jackson began lodging complaints about the use of the restraint board, Sergeant Weber issued a Notice of Violation Report, charging Jackson with having violated prison rules against abuse/harassment and disorderly conduct on May 13, 2014. (Wherley Aff., Ex. 9.) That report, much like Weber's incident report, indicated that Jackson had been "screaming and yelling incoherently as he punched and/or kicked [his] cell door," shouting "obscenities and insults as he continued his tirade of aggressive, toxic verbal abuse," and "admitted that he was only causing the disturbance in an attempt to manipulate health services staff into visiting him at his cell." (*Id.* at 2.) Jackson pleaded guilty to the disciplinary charges set forth in the Notice of Violation Report and waived his right to a disciplinary hearing.[8] (*Id.* at 3.)

---

[8]     Because, as explained later, this Court finds that the evidence does not show that the use of the restraint board violated the Eighth Amendment, it need not decide whether Jackson's claims of excessive force are in any way barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), given that they rely on factual allegations that directly contradict the prison disciplinary charges to which he pleaded guilty and was convicted. *See Sheldon v. Hundley*, 83 F.3d 231, 233 (8th Cir. 1996) ("Under *Heck*, when an inmate's success on a § 1983 claim would necessarily imply the invalidity of the result of a disciplinary proceeding that lengthens the inmate's prison sentence, the § 1983 claim does not arise until the state or a federal habeas court has invalidated the disciplinary result.").

## DISCUSSION

In his complaint, Jackson asserts an Eighth Amendment claim for inadequate medical care; claims under the Fifth, Eighth, and Fourteenth Amendments for excessive force in the use of the restraint board; and an Eighth Amendment claim for the deprivation of "the minimal civilized measure of life's necessities" in the denial of access to a bathroom and shower. (Compl. ¶¶ 60–68.) The defendants move for summary judgment on each of Jackson's claims, contending that he has not demonstrated a constitutional violation and, even if he had, that they are otherwise entitled to qualified immunity. (*See* Def.'s Mem. 1–2, 18–42.)

## I.  Standards of Review

Summary judgment is appropriate if the evidence in the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Thomas v. Heartland Emp't Servs., LLC*, 797 F.3d 527, 529 (8th Cir. 2015). The moving party bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011). If it does so, the nonmoving party "may not . . . rest on mere allegations or denials," but must point to evidence "of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (quotation omitted); *see also* Fed. R. Civ. P. 56(c)(1). The mere existence of a factual dispute will not defeat a motion for summary judgment unless that dispute is "genuine,"

19

meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is "merely colorable" or "not significantly probative," *id.* at 249, or is otherwise insufficient to "lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted), then there is no genuine issue for trial. In deciding a summary judgment motion, a court need not accept a nonmoving party's unsupported allegations, *see Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009), conclusory statements, *see Heisler*, 339 F.3d at 628, or other statements that are "blatantly contradicted by the record," such that "no reasonable jury could believe" them, *Edwards*, 750 F.3d at 733 (quotation omitted). *See also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Furthermore, where a defense of qualified immunity is raised on summary judgment, the question is not merely whether the plaintiff has presented sufficient evidence of a constitutional violation. *See Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008). Under qualified immunity, government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome a qualified immunity defense on

summary judgment, a plaintiff must show two things: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). A right is clearly established if its "contours were sufficiently definite that any reasonable official in [the defendant's] shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *City & Cty. of S.F., Cal. v. Sheehan*, — U.S. —, 135 S. Ct. 1765, 1774 (2015) (quotations, citation, and alterations omitted). Whether a defendant has violated a clearly established right "must be undertaken in light of the specific context of the case, not as a broad general proposition," because the dispositive question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004); *see also Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004). This exacting standard "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. —, 131 S. Ct. 2074, 2085 (2011) (quotation omitted). In other words, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis*, 375 F.3d at 712 (quotation omitted).

## II.  Official Capacity, Injunctive Relief, and Substantive Due Process

Several of Jackson's claims can readily be disposed of, including his official capacity claims against Warden Grandlienard and his substantive due process claims

under the Fifth and Fourteenth Amendments. First, the defendants rightly argue that the

Eleventh Amendment bars Jackson from seeking monetary damages under 42 U.S.C.

§ 1983 against Grandlienard in his official capacity, and that Jackson's claims for

injunctive relief are now moot because Grandlienard retired in March 2015 and, as such,

no longer has the authority to affect DOC policies. (*See* Def.'s Mem. 12–13, 16–17);

*Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (explaining that "absent waiver by the

State or valid congressional override, the Eleventh Amendment bars a damages action

against a State in federal court," which includes "when State officials are sued for

damages in their official capacity"); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66

(1989) ("Congress, in passing § 1983, had no intention to disturb the State's Eleventh

Amendment immunity . . . ."); *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 800 (8th Cir.

2002) (noting that Minnesota has not waived its sovereign immunity from suit in federal

court); *Tara Enters., Inc. v. Humble*, 622 F.2d 400, 402 (8th Cir. 1980) (holding that

claims for equitable relief against former government officials were moot because they

"no longer possess[ed] any official power"). Indeed, Jackson concedes that those

particular claims against Grandlienard should be dismissed. (Doc. No. 134, Pl.'s Mem. in

Opp'n to Summ. J. 2; Pl.'s Decl. 2.)

     Second, as he also concedes, Jackson cannot sue any of the defendants under the

Fifth Amendment's Due Process Clause because it applies only to federal officials, not

the state officials involved in this action. (*See* Pl.'s Mem. 18); *Barnes v. City of Omaha*,

574 F.3d 1003, 1005 n.2 (8th Cir. 2009) ("The Fifth Amendment's Due Process Clause

applies only to the federal government or federal actions . . . .").

Finally, while the Fourteenth Amendment's guarantee of substantive due process does apply to state actors, the Supreme Court has cautioned that where another Amendment "provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). For convicted prisoners like Jackson, it is the Eighth Amendment's ban on cruel and unusual punishment, not the Fourteenth Amendment's guarantee of due process, that "serves as the primary source of substantive protection" against allegedly abusive conditions of confinement. *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *see also Graham*, 490 U.S. at 395 n.10 (explaining that "the Due Process Clause protects a pretrial detainee from the use of excessive force" and, "[a]fter conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where the deliberate use of force is challenged as excessive and unjustified") (quotation and ellipsis omitted).

Because the Eighth Amendment covers prisoner claims challenging the conditions of their confinement, that Amendment—not the Fourteenth Amendment's guarantee of substantive due process—governs. *See McChristian v. Hampton*, 48 F.3d 1224, 1224 (8th Cir. 1995) (unpublished table decision) (holding that a prisoner's excessive force claim was properly analyzed under the Eighth Amendment and not substantive due process). Indeed, even if substantive due process applied in the prison context, the Supreme Court has made clear that it would afford "no greater protection than does the Cruel and Unusual Punishments Clause." *Whitley*, 475 U.S. at 327. Since Jackson's claims

challenging the conditions of his confinement live or die under the applicable Eighth Amendment standards, this Court recommends that his substantive due process claims under the Fourteenth Amendment be dismissed, even if only as duplicative of his Eighth Amendment claims. With that mind, this Court will now turn to the merits of Jackson's Eighth Amendment claims.

### III. Eighth Amendment Claims

The Eighth Amendment is not "a font of tort law," *Robinson v. Moreland*, 655 F.2d 887, 890 (8th Cir. 1981) (quotation omitted), that applies to every harsh or restrictive prison condition, *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), or "every government action affecting the interests or well-being of a prisoner," *Whitley*, 475 U.S. at 319. Rather, the Eighth Amendment only prohibits government actions that rise to the level of "cruel and unusual punishment," which in the prison context means the "unnecessary *and wanton infliction of pain*." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (emphasis in original) (quoting *Whitley*, 475 U.S. at 319). It is, as the Supreme Court has underscored, "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley*, 475 U.S. at 319.

Eighth Amendment claims consist of both objective and subjective elements, which respectively ask whether the claimed deprivation was "sufficiently serious" or objectively "harmful enough" and whether prison officials subjectively acted with a

"sufficiently culpable state of mind." *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Wilson*, 501 U.S. at 298. What a prisoner must establish with respect to those elements, however, "varies according to the nature of the alleged constitutional violation." *Hudson*, 503 U.S. at 5. Whenever an inmate alleges an Eighth Amendment claim for excessive force, including in the use of restraints, he must show that the use of force was more than *de minimis* and that it was applied "maliciously and sadistically for the very purpose of causing harm." *Id.* at 6–7, 9–10; *see also Howard v. Barnett*, 21 F.3d 868, 872 (8th Cir. 1994). For claims alleging inadequate medical care, an inmate must show an "objectively serious medical need" and that the prison officials "actually knew of, but deliberately disregarded, [that] need." *Nelson v. Shuffman*, 603 F.3d 439, 448 (8th Cir. 2010). And for claims challenging other conditions of confinement as cruel and unusual punishment, a prisoner must establish a "serious" or "extreme" deprivation of "the minimal civilized measure of life's necessities," and that prison officials deliberately disregarded "an excessive risk to inmate health or safety." *See Hudson*, 503 U.S. at 9; *Wilson*, 501 U.S. at 304; *Farmer*, 511 U.S. at 837. Regardless of the type of claim at issue, mere negligence or a lack of due care for a prisoner's interests or safety does not violate the Eighth Amendment. *See Wilson*, 501 U.S. at 305; *Whitley*, 475 U.S. at 319.

### A.  Deliberate Indifference to Medical Needs — Nurse Hereford

Jackson claims that Nurse Hereford acted with deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, by failing to conduct an adequate medical examination into his symptoms, failing to provide adequate medical care, and medically clearing him for placement on the restraint board. (Compl. ¶ 60; *see*

*also* Pl.'s Mem. 9; Pl.'s Decl. 1.) In seeking summary judgment, Hereford argues that

Jackson has not shown that he was suffering from an objectively serious medical need,

either before or after his placement on the board, or that she was deliberately indifferent

to any such need. (Defs.' Mem. 26–30; Defs.' Reply 13.) Relying on Jackson's medical

records and an affidavit from Dr. David Paulson, the DOC's medical director, Hereford

notes that Jackson's reported symptoms were not likely side effects of Effexor or

indicative of a serious medical condition, that her own evaluation indicated that Jackson

was not suffering from a medical need requiring immediate care, that Jackson denied

having chest pains while on the restraint board, and that he has not experienced any

medical emergencies since the events of May 13, 2014. (Defs.' Mem. 28–29.)

Jackson counters Hereford's contentions with a printout from Drugs.com

regarding Effexor, which lists potential side effects that "may require medical attention"

and advises patients that they "should check with [their] doctor immediately" if they

begin to experience, among other things, chest pains, high blood pressure,

lightheadedness, trouble breathing, nausea, vomiting, or "shaking that is hard to control."

(Doc. No. 137, Pl.'s Ex. 12 at 1–4.) Jackson maintains that this printout demonstrates

both that he was suffering from a serious medical need requiring a doctor's immediate

attention, and that Hereford acted with deliberate indifference to that need when she

failed to "examine [him] to determine the reason for his shaking that was hard to

control," provide any treatment for that shaking, or notify a doctor about it. (Pl.'s

Mem. 25–28.) He asserts that Hereford's examination was "completely inadequate," as

she did not evaluate his "reported or observed medical complications" before medically clearing him for placement on the restraint board. (*Id.* at 4.)

   To establish an Eighth Amendment violation for inadequate medical care, a plaintiff must show an "objectively serious medical need" and that the "defendant actually knew of, but deliberately disregarded, such need." *Laganiere v. Cty. of Olmsted*, 772 F.3d 1114, 1116 (8th Cir. 20014). An objectively serious medical need "is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008) (quotation omitted). Whether a medical need is sufficiently obvious "cannot be analyzed in a vacuum," but must be evaluated in terms of "prison officials' background knowledge" and whether that "knowledge made it obvious that [the plaintiff's] symptoms required medical attention." *Id.* at 482–83. The seriousness of a medical need "should also be measured by reference to the effect of delay in treatment," *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997), including the presence of any "verifying medical evidence" of an "acute or escalating situation or that delays adversely affected [the plaintiff's] prognosis," *Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997). In other words, "context is everything." *Martinson v. Leason*, 22 F. Supp. 3d 952, 963 (D. Minn. 2014).

   As to the subjective component of such a claim, the deliberate-indifference standard requires a mental state "akin to criminal recklessness," demanding that the defendant consciously disregard a known and substantial risk of serious harm through actions that are "so inappropriate as to evidence intentional maltreatment or a refusal to

provide essential care." *Jackson v. Buckman*, 756 F.3d 1060, 1065–66 (8th Cir. 2014) (quotations omitted); *see also Farmer*, 511 U.S. at 837–38 (1970); *Dulany*, 132 F.3d at 1240–42. A plaintiff must "show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quotation omitted). A failure to receive a preferred course of treatment or evidence that merely implicates a medical professional's judgment does not raise a constitutional issue, as the Eighth Amendment neither prohibits medical professionals from "exercising their independent medical judgment" nor guarantees "any particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). The Eighth Amendment only requires prison officials to reasonably respond to a known risk of harm. *Farmer*, 511 U.S. at 844.

The evidence, even when viewed in Jackson's favor, does not support a finding that he was suffering from an objectively serious medical need, either before, during, or after his placement on the restraint board. Jackson was not diagnosed by a physician as requiring treatment and, given the medical evidence in the record, it would not have been patently obvious to a layperson that Jackson required a doctor's immediate attention. During his medical evaluation with Nurse Hereford, Jackson indicated that he had been experiencing chest pains, lightheadedness, and shortness of breath, and had been "spitting up . . . a thick-type foam." (Wherley Aff., Ex. 7; *see also* Hereford Aff. ¶ 12.) At no point during the evaluation did Jackson complain of vomiting or fainting, nor did he mention that he believed he was suffering side effects from Effexor. (*See* Wherley Aff., Ex. 7; Hereford Aff. ¶¶ 12–13.) Although Hereford noted that Jackson was "kind of shaky," she

determined that his vital signs—including his blood pressure, pulse, oxygen saturation level, and respiration rate—were all within normal limits, that his skin was warm and dry, and that he was breathing normally and able to speak in full sentences. (*See* Hereford Aff. ¶¶ 13–16; Paulson Aff., Ex. 5 at 11; Wherley Aff., Ex. 7; Pl.'s Decl. ¶ 20.) Hereford thus concluded that Jackson was not suffering from an acute medical need requiring further evaluation or treatment by a doctor. (Hereford Aff. ¶¶ 13–18.)

Hereford's conclusion was supported by subsequent events, as Jackson did not complain of chest pains or shortness of breath while on the restraint board and, since May 2014, has not suffered any medical emergencies. (*See* Hereford Aff. ¶¶ 25–26; Paulson Aff. ¶ 17, Ex. 5 at 11–16 , & Ex. 6 at 5–7; Pl.'s Decl. ¶¶ 24, 26; Pl.'s Depo. 132.) The medical evidence, in other words, does not show that Jackson's condition was "acute or escalating" or deteriorated over time without further treatment. *See Dulany*, 132 F.3d at 1243 ("The objective portion of the deliberate indifference standard requires a showing of 'verifying medical evidence' that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the type of injury in [the] case."). Moreover, Dr. Paulson, having reviewed Jackson's medical records, has found that it is "highly unlikely" that Jackson's symptoms were caused by Effexor, as he started the medication more than five months earlier without any noted side effects, and that there is no indication that Jackson "suffers from a serious or life-threatening medical condition or that he suffered from such a condition in May 2014." (Paulson Aff. ¶¶ 7, 12.) Taking Jackson's symptoms "in context," including Hereford's knowledge and the lack of medical evidence showing that Jackson's condition deteriorated over time, "a reasonable

jury could not find that [Jackson] had a medical need so obvious that a layperson would easily recognize the need for a doctor's immediate attention." *Jones*, 512 F.3d at 483; *see also Dulany*, 132 F.3d at 1243.

Furthermore, even if Jackson was suffering from an objectively serious medical need, the evidence does not establish that Hereford knowingly disregarded that need through actions that were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *See Jackson*, 756 F.3d at 1065–66 (quotation omitted). Hereford listened to Jackson's complaints, took his vital signs, and concluded in her professional opinion that he was not suffering from a medical emergency requiring further evaluation or treatment. She later reviewed his medical file, which likewise failed to give her any cause for concern. (*See* Hereford Aff. ¶¶ 21–22.) There is no evidence that Hereford, either during or after her medical evaluation, was both aware of facts from which the inference could be drawn that Jackson faced a substantial risk of serious harm and actually drew that inference. *See Farmer*, 511 U.S. at 837 (holding that a prison official cannot be deemed to have acted with deliberate indifference unless she is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and actually "dr[e]w the inference"). To the contrary, the evidence shows that Hereford subjectively believed that Jackson was *not* faced with a substantial risk of serious harm given his vital signs, warm and dry skin, ability to breathe and talk normally, and known medical history. And that belief has been corroborated by Dr. Paulson, who has testified that "given that [Jackson's] vitals were within normal limits," there were no "further tests or evaluations that should have been provided to Jackson at

that time." (Paulson Aff. ¶ 16.) Jackson's disagreement with Hereford's judgment and the scope of her evaluation cannot support an Eighth Amendment claim. *See Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) ("A mere difference of opinion over matters of expert medical judgement or a course of medical treatment fails to rise to the level of a constitutional violation."); *Dulany*, 132 F.3d at 1240 ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment.").

Jackson nevertheless maintains that the Effexor printout from Drugs.com shows that he was suffering from a serious medical need requiring a doctor's attention and that Hereford acted with deliberate indifference by failing to contact a physician, particularly given her observation that he was shaking. (*See* Pl.'s Mem. 25–28.) This Court disagrees for several reasons. First, Jackson is not qualified to offer a medical opinion about the source or severity of his condition, *see In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 960 (D. Minn. 2009), and the Drugs.com printout does not otherwise support his assertion that he was actually suffering from a serious medical need. The printout merely notes that certain side effects of Effexor "may require medical attention" and that, if experienced, a patient "should check with [their] doctor immediately." (Pl.'s Ex. 12 at 1–4.) Here, Jackson received medical attention from Hereford, who concluded in her professional opinion that the symptoms he reported were not indicative of a serious underlying condition requiring further evaluation or treatment.

Second, there is no indication that Hereford, at the time of her medical evaluation, was even aware of Jackson's Effexor prescription or its possible side effects or, more importantly, that she subjectively concluded that the shaking she observed was both caused by Effexor and indicative of a substantial risk of serious harm.[9] *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment."). Because the evidence does not support a finding that Jackson was suffering from a serious medical need or that Hereford actually knew of that need and deliberately disregarded it, there is no genuine issue for trial and Hereford is entitled to summary judgment on the Eighth Amendment claim against her.

---

[9]     This Court further notes that, even if the Drugs.com printout materially substantiated Jackson's claim of a serious medical need, it would not be admissible at trial and therefore cannot serve to defeat the defendants' motion for summary judgment. *See Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir. 1986) ("Without a showing that admissible evidence will be available at trial, a party may not rely on inadmissible hearsay in opposing a motion for summary judgment."); *Sanders v. McKinney*, No. C 12-3029, 2014 WL 941624, at *4 n.4 (N.D. Iowa Mar. 11, 2014) (holding that WebMD printouts were inadmissible hearsay that could not be considered on summary judgment); *Jackson v. Hartford Life and Accident Ins. Co.*, No. 1:12-cv-66, 2013 WL 1249547, at *4 (N.D. Fla. Mar. 27, 2013) (holding that a Mayo Clinic printout was inadmissible hearsay that could not be used to defeat a summary judgment motion). The printout is not, as Jackson contends, "equivalent to a medical professional['s] affidavit" (Doc. No. 154 at 3), as it is not a sworn declaration made under penalty of perjury by a particular person who is competent to testify about the matters stated therein based on his or her personal knowledge. *See* Fed. R. Civ. P. 56(c)(4) & advisory committee's notes to 2010 amendment; *see also Peak ex. rel. Peak v. Central Tank Coating, Inc.*, 606 F. App'x 891, 895 (10th Cir. 2015) (holding that certain scientific reports were "not competent evidence on summary judgment" because they were neither sworn to under oath nor certified as true under penalty of perjury).

**B.  Use of the Restraint Board — Lieutenant Gutzmer and Sergeant Weber**

Jackson claims that Lieutenant Gutzmer and Sergeant Weber subjected him to excessive force, in violation of the Eighth Amendment, when they respectively ordered and authorized his placement on the restraint board "without need or provocation." (Compl. ¶¶ 61–62.) In moving for summary judgment, Gutzmer and Weber contend that there is no evidence that the restraint board was used maliciously and sadistically for the very purpose of causing harm, as required to establish an Eighth Amendment violation. (Defs.' Mem. 31–32.) Instead, they maintain that they "reasonably believed that Jackson was self-injurious and/or out of control" and that he would continue to engage in such behavior if he were not restrained. (*Id.* at 33–34.) Weber also asserts that, contrary to Jackson's contention, he did not order (or even have the authority to order) Jackson's placement on the restraint board, but only reported to his supervisor, Gutzmer, that Jackson was engaging in self-injurious behavior. (*Id.*) Jackson responds that the use of the restraint board was wholly unnecessary because he was not hurting himself, but merely hitting his cell door with a grease container, and by the time he was placed on the board, he had already stopped any negative behavior and was calm and cooperative. (Pl.'s Mem. 4, 20–23, 29–37, 47.) He therefore argues that "there would have been no basis for a reasonable officer to believe force was needed at that time to prevent [him] from endangering himself or others," and that "it is hard to conceive how . . . Gutzmer's decision to authorize [the use of restraints] was made in good faith when he made this authorization knowing that [Jackson had] ceased any perceived negative behavior." (*Id.* at 33–37) (quotations and emphasis omitted).

33

Whenever prison officials stand accused of using excessive force, the "core judicial inquiry" is whether the force used was applied "maliciously and sadistically for the very purpose of causing harm. *Hudson*, 503 U.S. at 5; *see also Howard*, 21 F.3d at 872. To prevail on such a claim, a plaintiff must establish that the defendants acted both "maliciously"—that they undertook, "without just cause or reason, a course of action intended to injure another"—and "sadistically"—that they "engag[ed] in extreme or excessive cruelty" or "delight[ed] in cruelty." *Howard*, 21 F.3d at 872. Factors relevant to this heightened state-of-mind requirement include the need for the use of force, the relationship between that need and the amount of force used, efforts to temper the severity of a forceful response, the degree of injury, and "the extent of the threat to the safety of staff or inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." *Whitley*, 475 U.S. at 321; *see also Howard*, 21 F.3d at 871–72. In the specific context of restraints, courts have also looked to whether officials complied with prison policies governing the use of restraints; whether the inmate had a history of disobedience and was confined in a segregated unit reserved for those who had proven themselves to be particularly unruly; and whether steps were taken to safeguard the inmate's physical well-being while restrained, including routine monitoring and examinations by medical staff. *See Key v. McKinney*, 176 F.3d 1083, 1086 (8th Cir. 1999); *Williams v. Benjamin*, 77 F.3d 756, 766 (4th Cir. 1996); *Campbell v. Sikes*, 169 F.3d 1353, 1376–77 (11th Cir. 1999); *Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir. 1991).

When evaluating these factors, it is important to bear two principles in mind. First, the use of force does not violate the Eighth Amendment simply because it appears, particularly in hindsight, to have been objectively unreasonable "and hence unnecessary in the strict sense." [10] *Whitley*, 475 U.S. at 319. Rather than focusing on the objective necessity or "reasonableness of a particular use of force," including "the existence of arguably superior alternatives," the Eighth Amendment question asks whether "the use of force *could plausibly have been thought necessary*, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 321–22 (emphasis added); *see also Williams*, 77 F.3d at 743–44 ("[T]he necessity of the [defendants'] actions is not the proper focus of the inquiry. Instead, we focus on whether the evidence supports the inference that the [defendants] wantonly punished [the plaintiff]."). A prisoner must therefore show that "there was no plausible basis" for believing that the use of force was necessary to maintain order or security; a showing of negligence or "ordinary errors of judgment" are not enough. *Whitley*, 475 U.S. at 322–24; *see also Hickey v. Reeder*, 12 F.3d 754, 758 (8th Cir. 1993).

---

[10]    In support of his Eighth Amendment claim, Jackson cites the Supreme Court's statement in *Graham v. Connor*, 490 U.S. at 396, that force is excessive when it is "objectively unreasonable in light of the facts and circumstances confronting [the defendants]." (Pl.'s Mem. 29.) *Graham*, however, was addressing a Fourth Amendment claim of excessive force, rather than an Eighth Amendment claim, and expressly distinguished the Fourth Amendment's standard of "objective reasonableness" from the "less protective Eighth Amendment standard," which requires an inquiry into "subjective concepts like 'malice' and 'sadism.'" *Id.* at 397–99.

Second, prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley*, 475 U.S. at 321–22 (quotation omitted); *see also Kingsley v. Hendrickson*, — U.S. —, 135 S. Ct. 2466, 2474 (2015) (recognizing that "running a prison is an inordinately difficult undertaking" and that "safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face") (quotations omitted). While that deference "does not insulate from review actions taken in bad faith and for no legitimate purpose," it does demand that "neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Whitley*, 475 U.S. at 322. Ultimately, a prison official is entitled to summary judgment on a claim of excessive force unless the evidence, viewed in the light most favorable to the plaintiff, supports "a reliable inference" that force was applied maliciously and sadistically for the purpose of causing harm. *Id.*

Here, the evidence does not support a reliable inference that the restraint board was used maliciously and sadistically for the very purpose of punishing Jackson, rather than in an effort, however mistaken or overzealous, to maintain institutional order, discipline, and security. And even if the evidence were sufficient to raise such an inference, the defendants are otherwise entitled to qualified immunity because existing caselaw does not place the constitutionality of their actions beyond debate.

**1. The Evidence Fails to Demonstrate an Eighth Amendment Violation**

Initially, the Court notes that the evidence submitted by Jackson and the defendants reflects a factual dispute as to the exact nature of Jackson's conduct on May 13, 2014. In his declaration and deposition, Jackson asserts that he was knocking on his cell door with a "grease container" and, when Sergeant Weber arrived, he yelled out. (Pl.'s Decl. ¶¶ 13, 15; Pl.'s Depo. 68.) In their affidavits, Weber and Gutzmer state that Jackson was kicking and punching his cell door, yelling, and ignoring directives to stop that behavior. (Weber Aff. ¶¶ 5, 13; Gutzmer Aff. ¶¶ 8–9, 11, 33.) That factual dispute, however, does not preclude summary judgment on Jackson's excessive force claim because the issue is what the defendants "reasonably perceived . . . on the basis of the facts known to them" and whether, in light of those perceptions, "the use of force could plausibly have been thought necessary." *Whitley*, 475 U.S. at 321–22; *see also Williams*, 77 F.3d at 762 (holding that the use of mace did not violate the Eighth Amendment where prison guards reasonably perceived that they were targets of "foul-smelling liquids," even though those liquids were actually water). Even accepting Jackson's version of the events, Weber and Gutzmer had a plausible basis for believing that he had been punching and kicking his cell door, that he was engaging in potentially self-injurious or out-of-control behavior, and that the use of a restraint board was necessary to stop that behavior.

Jackson acknowledges that he was repeatedly knocking on his cell door with a grease container and that three of his neighboring inmates soon joined in the commotion by kicking their own cell doors. (*See* Pl.'s Decl. ¶¶ 13–14; Brown Decl. ¶¶ 4, 6; Najera Decl. 3.) Having heard at least some of that noise, and in light of his personal experience

with inmates hitting, punching, and kneeing their cell doors to the point of self-injury, Sergeant Weber had reasonable grounds for believing that Jackson was punching and kicking his cell door and, by extension, was either out of control or could potentially hurt himself. (*See* Weber Aff. ¶¶ 5–7, 17.) Based on the facts, as he reasonably perceived them, Weber activated the emergency response system, requesting a supervisor and a team of specially trained officers. (*Id.* ¶ 6.) Contrary to Jackson's conclusory assertion that Sergeant Weber "ordered" the use of a restraint board (Pl.'s Mem. 34), the evidence shows that Weber requested an emergency response for a self-injurious inmate without specifying what that response should be. (*See* Weber ¶ 6; Gutzmer Aff. ¶ 7); *Miller v. Solem*, 728 F.2d 1020, 1024 (8th Cir. 1984) ("Conclusive assertions of ultimate fact are entitled to little weight when determining whether a non-movant has shown a genuine issue of fact."). Indeed, Weber did not even have the authority to order Jackson's placement on the restraint board; under DOC policies, only a unit supervisor or watch commander, such as Lieutenant Gutzmer, can authorize the use of a restraint board. (*See* Weber Aff. ¶ 16; Ayers Aff., Ex. 12, DOC Policy 301.081(B)(2)(a).)

It was Lieutenant Gutzmer who made the decision to use the restraint board based, in part, on Weber's report that Jackson had been yelling and repeatedly hitting and kicking his cell door. (*See* Gutzmer Aff. ¶¶ 8, 11, 13.) On the basis of the information relayed by Weber, coupled with his own experience of inmates "break[ing] their toes, knuckles, feet, and wrists from kicking or punching their cell doors," Gutzmer could have plausibly thought that the restraint board was necessary to quell Jackson's seemingly disruptive behavior and prevent any potential for self-injury. (*See id.* ¶ 10); *Kingsley*, 135

S. Ct. at 2475 ("[A] court must judge the reasonableness of force used *from the*

*perspective and with the knowledge of the defendant officer*.") (emphasis added). That is

especially true given Jackson's documented history of unruly, often violent, and

sometimes self-injurious conduct, as well as his placement in a disciplinary segregation

unit reserved for inmates who pose a serious threat to themselves, others, or the orderly

operation of the prison. *See supra* pages 3–5; *Scroggins v. Davis*, 346 F. App'x 504, 505

(8th Cir. 2009) (holding that the use of four-point restraints did not violate the Eighth

Amendment where jail officials "reasonably regarded" the plaintiff as "high risk");

*Williams*, 943 F.2d at 1574–76 (holding that the use of four-point restraints did not

violate the Eighth Amendment where, among other things, the inmate had a "history of

persistent disobedience" and was housed in a disciplinary segregation unit "reserved for

those inmates who had demonstrated by their prior conduct that they were the most

difficult, unruly, and unmanageable members of the prison population"). The fact that

prison officials substantially complied with DOC policies governing the use of the

restraint board, including videotaping the events, obtaining medical clearance and a

mental health assessment, regularly monitoring Jackson's physical condition, and

limiting his placement on the board to less than four hours, provides further evidence that

they acted without malicious or sadistic intent. *See Key*, 176 F.3d at 1086 (finding no

Eighth Amendment violation in the use of restraints where inmates were "regularly

checked" and "medical conditions [were] considered," neither of which were consistent

with "wanton conduct"); *Williams*, 77 F.3d at 766 (explaining that compliance with

prison policies provides "powerful evidence that the application of force was tempered and that the officers acted in good faith in imposing restraints").

Jackson emphasizes that, by the time he was evaluated by Nurse Hereford and then placed on the restraint board, he had stopped any negative behavior and was calm and compliant. (*See* Pl.'s Mem. 33–37.) Lieutenant Gutzmer's decision to use the restraint board, however, preceded Jackson's medical evaluation and the Eighth Amendment does not require prison officials to release an inmate "simply because he has stopped lashing out for the time being," particularly where, as here, the inmate is restrained in such a way as to "make it difficult for [him] to engage in any kind of physical misbehavior." *Scroggins*, 346 F. App'x at 506; (*see also* Ayers Aff. ¶ 14 ("Jackson was restrained the entire time he was being evaluated so he was unable to act out in any way.")). Lieutenant Gutzmer had a plausible basis for fearing that Jackson, despite appearing calm and cooperative during his medical evaluation, would resume hitting his cell door if returned to his cell. (*See* Gutzmer Aff. ¶ 33.) While resort to the restraint board may have been objectively unnecessary, and while less severe measures may have been equally effective at mitigating the threat perceived by prison officials, the decision to use the restraint board does not, in and of itself, evince a malicious and sadistic intent to punish Jackson. *See Whitley*, 475 U.S. at 322 (explaining that evidence that raises "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives" is not enough to withstand summary judgment); *Campbell*, 169 F.3d at 1377 (holding that evidence that alternative forms of restraint "would have been equally effective and less-dehumanizing" was not alone

40

sufficient to support a jury finding of malice and sadism); *Williams*, 77 F.3d at 763–64

(holding that the use of four-point restraints, even if unnecessary, did not alone evince "a

sadistic or malicious intent to punish" where the defendants were not "unreasonable in

their apparent belief" that it was needed to maintain order). Nor is wantonness evidenced

by the fact that Jackson remained on the board for a total of three-and-a-half hours, as his

repeated removal of his head strap and continued yelling plausibly suggested to prison

staff that he was unwilling to control his behavior and comply with directives. (*See* Ayers

Aff. ¶ 16 & Ex. 11; Gutzmer Aff. ¶ 35, Pluff Aff. ¶ 7; White Aff. ¶ 9); *Williams*, 77 F.3d

at 765 ("[W]hen . . . prison administrators initially apply force in a good faith effort to

maintain discipline, '[h]ow long restraint may be continued calls for the exercise of good

judgment on the part of prison officials.") (quoting *Williams*, 943 F.2d at 1576).

   Measures comparable to and even more severe than what Jackson endured have

been found not to violate the Eighth Amendment's ban on cruel and unusual punishment.

*See, e.g.*, *Scroggins*, 346 F. App'x at 505 (placing an inmate in four-point restraints for

three hours and fifteen minutes); *Key*, 176 F.3d at 1084–86 (restraining an inmate in

handcuffs and leg shackles for twenty-four hours after he threw water on a prison guard's

leg); *Williams v. Delo*, 49 F.3d 442, 444–46 (8th Cir. 1995) (placing an inmate in a strip

cell without clothes or running water for four days, where the inmate did not suffer

physical injuries); *Campbell*, 169 F.3d at 1376–77 (using "L" shape restraints for twenty-

seven hours where officials complied with prison procedures, including monitoring the

inmate's physical condition); *Williams*, 943 F.2d at 1574–76 (placing an inmate in four-

point restraints for over twenty-eight hours, where the inmate was housed in a

41

segregation unit, had a "history of persistent disobedience," and prison officials took measures to safeguard his "physical well-being through constant monitoring and examinations by medical personnel"). And of those cases, the Third Circuit's decision in *Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000), is particularly instructive. There, an inmate who had repeatedly kicked his cell door and then engaged in a struggle with the responding officers, but who was "neither resisting nor physically combative" after he was removed his cell, was placed in a restraint chair for eight hours. *Id.* at 339–40. The inmate claimed that prison officials acted maliciously and sadistically because "(1) there was no need to use the restraint chair; (2) the restraint chair was much too severe a response under the circumstances; (3) the prison officials did not perceive him as an immediate threat when they placed him in the chair; and (4) the prison officials made no effort to temper the severity of their response even though it was clear that he posed no threat to institutional security." *Id.* at 345–46. The Third Circuit disagreed, concluding that the inmate had "established at most that prison officials over-reacted to the disturbance that [the inmate] caused" and that "such over-reacting [fell] short of supporting a finding that prison officials acted maliciously and sadistically to cause harm."[11] *Id.* at 346 (quotation omitted).

---

[11]     The Third Circuit recently distinguished *Fuentes* in *Young v. Martin*, 801 F.3d 172 (3d Cir. 2015), which involved an inmate who was secured "in a four-point restraint chair, naked, for fourteen hours," although he was "already subdued when subjected to mechanical restraint" and had not been "violent, combative, or self-destructive at any point during the incident leading up to his prolonged confinement in the restraint chair." *Id.* at 173, 181. In finding that there were "genuine disputes of material fact as to whether the Defendants' use of the restraint chair in this case violated the Eighth Amendment,"

(Footnote Continued on Next Page)

The same is true here. While the defendants may well have overreacted to the actual threat posed by Jackson to himself or institutional order, and may have guessed wrong about whether Jackson had truly calmed down and could safely be returned to his cell, any errors of judgment on their part do not support a finding that they used the restraint board with the malicious and sadistic intent to punish Jackson. *See Whitley*, 475 U.S. at 322–24 (emphasizing that negligence and "ordinary errors of judgment" do not rise to the level of an Eighth Amendment violation). Absent evidence that the defendants

---

(Footnote Continued from Previous Page)

the Third Circuit distinguished its earlier decision in *Fuentes* on several grounds, including that Fuentes had engaged in a physical alternation with prison staff and his placement in the restraint chair did not exceed the "eight-hour maximum otherwise permitted under prison regulations." *Id.* at 178, 180. Indeed, the *Young* decision placed repeated emphasis on the fact that the fourteen hours that the plaintiff was held in the restraint chair "significantly exceeded . . . the eight-hour maximum, absent special authorization, permitted by the prison's regulations." *Id.* at 175, 178, 182.

While the facts of this case do not perfectly align with either *Fuentes* or *Young*, but share certain similarities and dissimilarities with each, this Court finds them closer to *Fuentes*, both in terms of the threat perceived by prison officials and the length of time that restraints were used. Here, like in *Fuentes* and unlike in *Young*, prison officials had some plausible basis for believing that the prisoner posed a threat to safety, order, or security, and their use of restraints did not exceed the maximum time authorized by prison regulations. Moreover, the three-and-a-half hours that Jackson spent on the restraint board does not compare to the fourteen hours endured by Young. This Court also notes that the Third Circuit in *Young*, despite holding that the district court erred in granting summary judgment to the defendants on the merits of the plaintiff's Eighth Amendment claim, did not decide whether the defendants were otherwise entitled to qualified immunity given the state of the law at the time of their actions. *Id.* at 182. Instead, the court left that issue for the district court to consider in the first instance on remand. *Id.* As explained below, even if the evidence in this case was sufficient to create a genuine issue as to whether the use of the restraint board violated the Eighth Amendment, the defendants are nevertheless entitled to qualified immunity because the state of the law, in May 2014 and even now, did not clearly establish that their actions were unconstitutional.

acted in bad faith, this Court must defer to their judgment that the restraint board was

"needed to preserve internal order and discipline." *Id.* at 321–22.

The principal cases cited by Jackson in support of his Eighth Amendment claim—

*Buckley v. Rogerson*, 133 F.3d 1125 (8th Cir. 1998), *Thompson v. Zimmerman*, 350 F.3d

734 (8th Cir. 2003), and *Littlewind v. Rayl*, 839 F. Supp. 1369 (D.N.D. 1993)—do not

compel a contrary conclusion. In *Buckley*, the Eighth Circuit held that persons committed

to a state mental hospital for diagnosis and treatment cannot, consistent with due process,

be restrained on a non-emergency basis by non-medical personnel because doing so is

"more akin to punishment than treatment." 133 F.3d at 1127–31. *Buckley*'s holding that,

absent an emergency, "mentally disturbed patients can only be [restrained] for medical

purposes without running afoul of due process," *id.* at 1125, has no applicability in the

prison context because committed mental patients are "confined for treatment rather than

incarcerated for the purpose of punishment following conviction," *Revels v. Vincenz*, 382

F.3d 870, 874 (8th Cir. 2004), and therefore "cannot be punished at all, must less

maliciously and sadistically," *Kingsley*, 135 S. Ct. at 2475. As the Supreme Court has

emphasized, excessive force claims brought by prisoners and detainees are governed by

different constitutional standards — the former are protected by the Eighth Amendment,

which only prohibits punishment that is cruel and unusual, while the latter are protected

by due process, which proscribes any punishment at all. *Kingsley*, 135 S. Ct. at 2475.

*Thompson* and *Littlewind*, by contrast, are readily distinguishable on their facts. In

the former, the Eighth Circuit found sufficient evidence to support an excessive force

claim where a prisoner was physically beaten, suffering "a blow to the head, kicks to the

head, ribs, and groin, and injury to the eye socket and nose," after he had stopped yelling and kicking his cell door and walls. *Thompson*, 350 F.3d at 734. Given the particular facts and circumstances before it, the Eighth Circuit had no occasion to decide whether the Eighth Amendment would have prohibited prison officials from using restraints after Thompson had stopped acting out, rather than repeatedly hitting and kicking him. *See Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1031 (11th Cir. 2003) ("[T]he holdings of a prior decision can reach only as far as the facts and circumstances presented to the court in the case which produced that decision.") (quotation and citation omitted).

*Littlewind* is likewise distinguishable, involving an inmate who spent eight hours "hog-tied on a bare bed" without the ability to "lay flat" or use the bathroom, an additional twenty-three hours "in a stooped position with his wrists handcuffed together underneath one leg," and another seven-and-a-half days handcuffed and shackled naked in a constantly illuminated cell. 839 F. Supp. at 1370, 1373–74, 1376. In finding conduct "so egregious" as to violate the Eighth Amendment, the court in *Littlewind* emphasized the unrebutted testimony that the use of four-point restraints "could only be justified for periods of four hours or less" before it became "inhumane" and purely punitive, and distinguished cases in which prisoners were held in four-point restraints for twenty-eight hours or less, could "lie down flat," were constantly monitored, and were denied clothing for "periods of three days or less." *Id.* at 1374–75. The three-and-a-half hours that Jackson was kept in his underwear on the restraint board, where he could lie down flat and was regularly monitored, does not compare to the egregious conduct involved in

*Littlewind*; indeed, the circumstances of Jackson's restraint are far closer to the cases distinguished in *Littlewind* than to *Littlewind* itself.

In sum, while this Court in no way condones the DOC's policies regarding the use of restraint boards or the decision to use such restraints against Jackson, it finds that the evidence does not support a reliable inference that the board was used maliciously and sadistically for the very purpose of harming Jackson, rather than in an attempt, however mistaken, to maintain institutional order, discipline, and security. And absent evidence of such bad faith, neither this Court nor a jury is free to substitute its own judgment about the necessity of using the restraint board for that of the defendants. *See Whitley*, 475 U.S. at 322. Summary judgment is therefore appropriate on Jackson's claims of excessive force.

### 2.  The Defendants are Otherwise Entitled to Qualified Immunity

Even assuming that the evidence was sufficient to support a finding of malice and sadism in the use of the restraint board, Lieutenant Gutzmer and Sergeant Weber would still be entitled to qualified immunity on Jackson's excessive force claims. To overcome a defense of qualified immunity, a plaintiff must point to "controlling authority" or "a robust consensus of cases of persuasive authority" imposing liability on prison officials under similar circumstances. *Ashcroft*, 131 S. Ct. at 2084 (quoting *Wilson*, 526 U.S. at 617). Given the often "hazy border between excessive and acceptable force," which depends "very much on the facts of each case," Jackson must point to cases that "squarely govern[]" the situation confronted by the defendants, such that existing precedent placed the unconstitutionality of their actions "beyond debate." *Mullenix v.*

*Luna*, — U.S. —, 136 S. Ct. 305, 309–10 (2015); *see also Saucier v. Katz*, 533 U.S. 194,

206 (2001) ("Qualified immunity operates . . . to protect officers from the sometimes

hazy border between excessive and acceptable force . . . .").

Jackson has not pointed to a binding decision or a robust consensus of persuasive

authority that clearly establishes that the use of restraints under the specific circumstances

of this case violates the Eighth Amendment, such that the constitutionality of the

defendants' actions is beyond debate. As explained above, the cases cited by Jackson in

support of his excessive force claim are "too factually distinct to speak clearly to the

specific circumstances here." *See Mellenix*, 136 S. Ct. at 312. The constitutionality of the

defendants' use of the restraint board in this case falls within that sometimes hazy border

between excessive and acceptable force. *See Davis*, 375 F.3d at 712 (explaining that,

under the qualified immunity doctrine, officials can only be held liable for "transgressing

bright lines," not for making "bad guesses in gray areas"). Numerous decisions, including

from the Eighth Circuit, have rejected Eighth Amendment claims in arguably analogous,

if not more egregious, circumstances. *See, e.g.*, *Scroggins*, 346 F. App'x at 505; *Key*, 176

F.3d at 1084; *Selter-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995); *Williams*, 49 F.3d at

444–46; *Campbell*, 169 F.3d at 1376–77; *Williams*, 943 F.2d at 1574–76; *Fuentes*, 206

F.3d at 339–40, 345–46. And those decisions that have found Eighth Amendment

violations in the use of restraints have involved much graver circumstances than those at

issue here. *See Hope v. Pelzer*, 536 U.S. 730, 734–35, 738 (2002) (finding an Eighth

Amendment violation where a prisoner was handcuffed to a hitching post in the

oppressive Alabama heat for seven hours and subjected to "prolonged thirst," "taunting,"

and no bathroom breaks during that time); *Young*, 801 F.3d at 173–82 (securing an inmate in a four-point restraint chair for fourteen hours, far in excess of the eight-hour maximum authorized by prison regulations); *Barker v. Goodrich*, 649 F.3d 428, 431, 434 (6th Cir. 2001) (finding an Eighth Amendment violation where an inmate who simply slept through a prison count was "handcuffed behind his back for twelve hours, during which time he . . . was unable to sit or lie down without pain, use the restroom, or obtain water").

In light of existing precedent, this Court cannot say that it would have been "clear to a reasonable officer" in the defendants' shoes that the use of restraints "was unlawful in the situation [they] confronted," *see Brosseau*, 543 U.S. at 198–99, such that they can be deemed to have been "plainly incompetent" or "knowingly violate[d] the law," *Ashcroft*, 131 S. Ct. at 2085. Accordingly, even if Jackson could demonstrate a violation of his Eighth Amendment rights, Lieutenant Gutzmer and Sergeant Weber would still be entitled to qualified immunity.

## C. Failure to Intervene in the Use of Restraints — Psychologist Saari and Lieutenant White

Jackson claims that psychologist Saari and Lieutenant White violated the Eighth Amendment when they failed to intervene to prevent the alleged misuse of the restraint board. (Compl. ¶¶ 63–64; *see also* Pl.'s Mem. 10; Pl.'s Decl. 1.) In seeking summary judgment, Saari contends that she had no authority to order Jackson's removal from the restraint board and that, based on the reports she received from correctional staff, she had no reason to believe that the restraint board was being misused. (Defs.' Mem. 35.) White,

for his part, asserts that he was not involved in the initial decision to use the restraint

board and that he authorized Jackson's removal as soon as he was informed that Jackson

was willing to comply with staff directives and had stopped acting out by yelling and

removing his head strap. (*Id.* at 36.) Jackson, citing DOC policies requiring a mental

health professional to "determine if continued restraint is appropriate," argues that Saari

not only had the authority to have him removed from the restraint board, but that she

acted with deliberate indifference to his Eighth Amendment rights when, despite finding

him calm, cooperative, and non-injurious, she failed to provide "a clinical determination

as to whether [his] continued restraint . . . was appropriate." (Pl.'s Mem. 11, 38–39, 49.)

He also asserts that Lieutenant White ignored Saari's assessment that he was calm and

cooperative when he decided to continue the use of restraints. (*Id.* at 4, 40, 49.)

"A prison official may be liable for failure to protect an inmate from the use of

excessive force if he is deliberately indifferent to a substantial risk of serious harm to an

inmate." *Estate of Davis Ostenfeld v. Delo*, 115 F.3d 1388, 1395 (8th Cir. 1997); *see also*

*Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir. 1993). To meet that standard, a plaintiff

must show that the official "had reason to know that excessive force would be or was

being used." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015).

Jackson's failure-to-intervene claims against Saari and White necessarily fail

because, as explained above, the evidence does not support a finding that the use of the

restraint board was excessive under the Eighth Amendment. *See Hannah v. City of*

*Overland, Mo.*, 795 F.2d 1385, 1392 & n.5 (8th Cir. 1986) (noting that a defendant

cannot be held liable for failing to intervene if there is no underlying constitutional

violation); *Hicks v. Norwood*, No. 06-1086, 2010 WL 3522411, at *2 (W.D. Ark. Sept. 2,

2010) (finding no duty to intervene where the underlying use of force was not excessive).

But even aside from that fact, Jackson has not otherwise shown that Saari or White acted

with deliberate indifference to the alleged use of excessive force. Contrary to Jackson's

contention, DOC policies did not give Saari the authority to order his removal from the

restraint board. Her role as a mental health professional was limited to assessing his

mental condition and providing a clinical opinion to security staff about whether his

"continued restraint [was] appropriate"; it was ultimately up to security staff to decide

whether to terminate the use of restraints. (*See* Saari Aff. ¶¶ 12–14.) While Saari does not

appear to have made an express determination regarding whether continued restraint was

appropriate, she did notify security staff, including Lieutenant White, of her professional

opinion that Jackson was not self-injurious at the time of her assessment because he

appeared calm and compliant. (*See* Saari Aff. ¶¶ 9–11, 14.) To the extent Saari

technically violated DOC policies by failing to offer an explicit opinion about the

appropriateness of continued restraint, that violation does not amount to the denial of a

constitutional right or suggest that she acted with deliberate indifference. *See Walton v.*

*Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2014) ("[V]iolating an internal [prison] policy

does not *ipso facto* violate the Constitution . . . ."); *Phillips v. Norris*, 320 F.3d 844, 847

(8th Cir. 2003) ("[T]here is no federal constitutional liberty interest in having . . . prison

officials follow prison regulations."). Indeed, the undisputed evidence shows that Saari

had no reason to know that the restraint board was being misused, as she was informed,

whether rightly or wrongly, that Jackson had engaged in potentially self-injurious behavior by repeatedly kicking his cell door. (Saari Aff. ¶¶ 8, 12.)

Likewise, the evidence does not substantiate Jackson's claim that Lieutenant White simply ignored Saari's assessment, nor does it otherwise show that he had reason to believe that the restraint board was being misused. When Lieutenant White started his shift on May 13, 2014, he was informed that Jackson had been placed on the restraint board for kicking his cell door and acting out of control. (*See* White Aff. ¶¶ 4–5, 8.) Based on that information, coupled with his own experience witnessing "offenders with broken feet and toes from kicking their cell doors," White reasonably believed that Jackson's placement on the restraint board was warranted. (*See id.* ¶ 8.) Furthermore, White did not ignore Saari's report that Jackson was calm, cooperative, and polite during her mental assessment. White reviewed Saari's report and decided not to authorize Jackson's immediate removal from the board because, outside of his conduct during the mental assessment, he exhibited "negative and out of control behavior" by repeatedly removing his head strap and yelling. (*Id.* ¶¶ 7, 9.) For all of these reasons, this Court concludes that Saari and White are entitled to summary judgment on Jackson's claims that they failed to intervene to prevent the alleged use of excessive force.

### D.  Denial of Access to a Restroom and Shower — Officer McElroy, Sergeant Pluff, and Lieutenant Gutzmer

In his complaint, Jackson claims that Officer McElroy, Sergeant Pluff, and Lieutenant Gutzmer deprived him of "the minimal civilized measure of life's necessities," either by denying him access to a bathroom while he was restrained or, after

he urinated on himself, not allowing him to shower for two days. (Compl. ¶¶ 62, 65–66 & Attach. 1 ¶¶ 5–7; *see also* Pl.'s Mem. 12, 41.) Jackson has since conceded that his claim against Gutzmer "should be dismissed" because "there's a possibility defendant Gutzmer may have never been informed by his subordinates of the fact that [Jackson] was covered in urine . . . and needed to take a shower." (Pl.'s Mem. 12.) This Court agrees because, in addition to Jackson's concession, there is no indication that Gutzmer was ever informed of Jackson's requests to take a shower and Gutzmer has expressly disclaimed any awareness of those requests. (*See* Gutzmer Aff. ¶ 37.) The remaining defendants, Officer McElroy and Sergeant Pluff, contend that they are entitled to summary judgment because, among other things, the temporary deprivation of a restroom and shower did not rise to the level of an Eighth Amendment violation, particularly given that Jackson had access to running water and towels with which he could clean himself in his cell. (Defs.' Mem. 38.)

The Constitution "does not mandate comfortable prisons"; prison conditions may be "restrictive and even harsh" as long as they are not "inhumane." *Farmer*, 511 U.S. at 832–33 (quotations omitted). To establish that a particular condition of confinement violates the Eighth Amendment, a prisoner must show (1) a "sufficiently serious" deprivation of "the minimal civilized measure of life's necessities," and (2) that prison officials were deliberately indifferent to an "excessive risk to inmate health or safety," meaning that they actually knew of the risk and disregarded it. *Id.* at 834, 837; *accord Williams*, 49 F.3d at 445; *see also Hudson*, 503 U.S. at 9 ("[E]xtreme deprivations are required to make out a conditions-of-confinement claim."). Temporary deprivations of

basic hygiene needs, such as the use of a bathroom or shower, are not sufficiently grave to form the basis of an Eighth Amendment claim in the absence of physical injury or a substantial risk of serious harm through contamination. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) ("[T]he momentary deprivation of the right to use the bathroom, in the absence of physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation."); *Murillo v. MacDonald*, 536 F. App'x 753, 753 (9th Cir. 2013) ("[T]he short-term deprivation of bathroom facilities, without more, is not sufficiently grave to form the basis of an Eighth Amendment violation."); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) ("[T]o demonstrate that a deprivation is extreme enough to satisfy the objective component of an Eighth Amendment claim, a prisoner must . . . demonstrate a substantial risk of [] serious harm resulting from [his] unwilling exposure to the challenged conditions."). The length of time that a prisoner is "subjected to harsh conditions" is thus "a critical factor," as conditions that "may be tolerable for a few days are intolerably cruel for weeks or months." *Smith v. Copeland*, 87 F.3d 265, 267 (8th Cir. 1996).

Under the circumstances of this case, even when viewed in the light most favorable to Jackson, the temporary denial of a restroom and shower did not involve a sufficiently serious deprivation of the minimal civilized measure of life's necessities. When Jackson was initially placed on the restraint board, he was advised that he would be given the opportunity to use the restroom every half hour per prison policy, which permits such use if it can be accomplished "in a manner that maintains the safety of the staff and the offender." (*See* Wherley Aff., Ex. 7; Gutzmer Aff. ¶ 23; Ayers Aff., Ex. 12,

DOC Policy 301.081(B)(2)(g).) Jackson first requested to use the bathroom at 3:45 p.m., nearly two hours into his board placement, but agreed to wait until the next security check because there were not enough staff members available to safely remove him from the board. (*See* Pl.'s Decl. ¶¶ 30, 32; Pluff Aff. ¶¶ 10–11.) Jackson renewed his request to Officer McElroy at approximately 4:10 p.m., was told that he could not use the bathroom, and urinated on himself roughly fifteen minutes later. (*See* Pl.'s Decl. ¶ 31; Pl.'s Depo. 91; Ayers Aff., Ex. 11.) From the time Jackson first requested to use the bathroom until he urinated on himself, less than an hour had passed. While that deprivation may have been unjustified and, as Jackson describes, humiliating, it was not sufficiently lengthy or sufficiently harmful to form the basis of an Eighth Amendment claim.[12] *See Hartsfield v. Vidor*, 199 F.3d 305, 309–10 (6th Cir. 1999) (depriving an inmate of access to a toilet for

---

[12]     Jackson, citing *Hope v. Pelzer*, asserts that the Supreme Court has held that temporarily depriving a restrained inmate of a bathroom violates the Eighth Amendment because it creates a particular risk of discomfort and humiliation. (Pl.'s Mem. 43–44.) *Hope* held no such thing. Instead, the Supreme Court in *Hope* held that the cumulative impact of handcuffing an inmate to a hitching post for seven hours in the hot sun, without any bathroom breaks and with little water, rose to the level of an Eighth Amendment violation. *See* 536 U.S. at 738 (holding that "[t]he use of the hitching post *under these circumstances*," which included subjecting the plaintiff to "unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period," "unnecessary exposure to the heat of the sun," "prolonged thirst and taunting," and "to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation," violated the Eighth Amendment) (emphasis added). Furthermore, the Supreme Court has repeatedly emphasized that a particular condition of confinement must be sufficiently serious, grave, or extreme to support an Eighth Amendment claim. *See Hudson*, 503 U.S. at 9 (explaining that "extreme deprivations are required to make out a conditions-of-confinement claim" and that courts must ask whether the deprivation was "objectively harmful enough to establish a constitutional violation") (quotation omitted); *Wilson*, 501 U.S. at 298, 304 (noting that only a "serious deprivation" of "the minimal civilized measure of life's necessities" is "sufficiently grave to form the basis of an Eighth Amendment violation").

two eight-hour periods and allowing him to sit in his own urine, "while harsh, [was] not cruel and unusual punishment").

After he urinated on himself, Jackson was not allowed to take a shower for two days, though he did have access to running water, shampoo, and clean towels with which to wash up in his cell. (*See* Pl.'s Decl. ¶¶ 38–39; Pl.'s Depo. 94–95; Pluff Aff. ¶ 15.) Jackson, relying on cases involving unprotected contact with human waste, argues that his inability to shower while covered in urine, which left him nauseous, itchy, and humiliated, rose to the level of an Eighth Amendment violation. (Pl.'s Mem. 44; *see also* Pl.'s Decl. ¶ 41.) The cases cited by Jackson, however, are materially different from this one, involving exposure to raw sewage or human excrement for lengthy periods of time, where the likelihood of contracting a serious disease was obvious. *See Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990) (holding that "forcing inmates to work in a shower of human excrement without protective clothing and equipment" violated the Eighth Amendment, as prison officials clearly should have known it could cause disease); *Howard v. Adkison*, 887 F.2d 134, 136–37 (8th Cir. 1989) (finding an Eighth Amendment violation where an inmate's cell was "covered with filth and human waste" for two years).

The nausea, itching, and humiliation that Jackson endured as a result of being covered in urine for two days, though undoubtedly unpleasant, are not sufficiently serious harms for Eighth Amendment purposes. *See Smith*, 87 F.3d at 268–69 (holding that forcing an inmate "to endure the stench of his own feces and urine" for four days after his toilet overflowed did not rise to the level of a constitutional violation); *Cunningham v.*

55

*Eyman*, 17 F. App'x 449, 454 (7th Cir. 2001) (holding that four to five hours in soiled clothing, "[t]hough certainly unpleasant," was "not of sufficient severity to implicate the Eighth Amendment"); *Shakka*, 71 F.3d at 167–68 (holding that preventing an inmate from "showering for three days after having human excrement thrown onto him" did not violate the Eighth Amendment where there was no evidence that he was exposed to a "significant risk of future harm"). And even if they were, Jackson was not deprived of any and all means of cleaning himself; he had access to running water, shampoo, and clean towels in his cell. While he certainly would have "preferred a shower" over washing up in his cell, requiring him to do the latter did not deprive him of "the minimal civilized measure of human necessities in such a palpable way" as to support an Eighth Amendment claim. *See Shakka*, 71 F.3d at 168 (finding no Eighth Amendment violation in the three-day denial of a shower where the inmate "was provided with water and cleaning materials with which to clean himself"); *accord Nelson v. Harris*, No. 94-15614, 1996 WL 4370, at *4 (9th Cir. Jan. 4, 1996) ("The denial of a shower for four days, where a sink is provided in a prisoner's cell, does not rise to the level of an Eighth Amendment violation.").

### E.  Supervisory Liability — Associate Warden Reishus and Warden Grandlienard

Finally, Jackson claims that Associate Warden of Operations Reishus contributed to the alleged Eighth Amendment violations by failing to properly train prison staff, and that Warden Grandlienard did so by "antagonizing [him]," failing to write "a descriptive definition of self-injurious behavior," and neglecting to implement rules allowing

restrained inmates to use the bathroom and shower to remove bodily waste. (Compl. ¶ 67 & Attach. 1 ¶ 8.) In particular, Jackson maintains that Grandlienard antagonistically replied to his complaints of excessive force when he said, "If you think being disruptive . . . is a way to get what you want, clearly that did not work out well for you," and he further faults Grandlienard for not taking corrective action in response to those complaints, including ordering an investigation. (*See* Compl. ¶ 57; Pl.'s Mem. 16–17.)

Prison supervisors such as Reishus and Grandlienard "may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory"; instead, a supervisor may only be held liable if he directly participated in a constitutional violation or if his "failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001). To establish supervisory liability, a plaintiff "must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts," meaning that "the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.*; *see also Sanders v. Brewer*, 972 F.2d 920, 923 (8th Cir. 1992) ("To hold supervisors liable under section 1983, a plaintiff must show that a superior had actual knowledge that his or her subordinates caused deprivations of constitutional rights and that he or she demonstrated deliberate indifference or tacit authorization of the offensive acts by failing to take steps to remedy them.") (quotation and brackets omitted). In addition, "[a] single incident, or a series of isolated incidents, usually will not provide a sufficient basis to assign supervisory liability." *Sanders*, 972 F.2d at 923.

Neither Reishus nor Grandlienard personally participated in the events of May 13, 2014, including the decision to place Jackson on the restraint board. Jackson concedes that he "lacks sufficient evidence" to establish supervisory liability against Reishus and, consequently, that his claim against Reishus "should be dismissed." (Pl.'s Mem. 2–3; *see also* Pl.'s Decl. 2.) This Court agrees, both because Jackson has failed to establish an underlying constitutional violation and because the undisputed evidence otherwise shows that Reishus was not himself responsible for training prison staff on DOC policies, including those governing the use of restraints. (*See* Reishus Aff. ¶ 18); *Williams v. Davis*, 200 F.3d 538, 539 (8th Cir. 2000) ("Absent a constitutional violation, there [is] no basis for section 1983 liability on the part of [supervisors].").

Although Jackson makes no similar concession with regard to Warden Grandlienard, this Court likewise finds no basis for imposing supervisory liability on him. Because, as previously explained, Jackson has failed to demonstrate an Eighth Amendment violation, there is simply no underlying constitutional violation upon which to predicate supervisory liability. *See Schoettle v. Jefferson Cnty.*, 788 F.3d 855, 861–62 ("We have long held that neither municipal nor supervisory liability may attach in section 1983 actions unless individual liability is first found on an underlying substantive claim."). In any event, Warden Grandlienard is otherwise entitled to summary judgment because the record fails to support a reasonable inference that he deliberately disregarded or tacitly authorized a known constitutional violation, let alone a known pattern of unconstitutional acts involving the use of restraints. *See Sanders*, 972 F.2d at 923. Based on the information available to him, including Captain Ayer's use-of-force review and

the incident reports completed by prison staff, Grandlienard had no reason to believe that Jackson's placement on the restraint board was improper or otherwise amounted to cruel and unusual punishment under the Eighth Amendment. (*See* Grandlienard Aff. ¶¶ 9–11.) Jackson's "uncorroborated grievances" to Grandlienard are not sufficient to show that Grandlienard "ever had the requisite knowledge or drew the necessary inferences to support a [finding] of deliberate indifference." *See Lenz v. Wade*, 490 F.3d 991, 996 (8th Cir. 2007). And Grandlienard's mere denials of Jackson's grievances cannot support the imposition of supervisory liability, even if those denials were, as Jackson claims, antagonistic in tone. *See Thomas v. Banks*, 584 F. App'x 291, 291 (8th Cir. 2014) ("[P]rison officials' failure to process or investigate grievances, without more, is not actionable under § 1983.") (citing *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993)); *Rowe v. Norris*, 198 F. App'x 579, 580 (8th Cir. 2006) (denying grievances related to an alleged constitutional violation is "insufficient to impose liability").

## CONCLUSION

In sum, this Court finds that the record evidence, even when viewed in the light most favorable to Jackson, fails to demonstrate that the relevant defendants acted with deliberate indifference to an objectively serious medical need, authorized the use of the restraint board with the malicious and sadistic intent to punish Jackson or otherwise violated clearly established law in doing so, or subjected Jackson to a sufficiently serious deprivation of the minimal civilized measure of life's necessities when they temporarily denied him access to a restroom and shower. There is thus no genuine trial issue precluding summary judgment on Jackson's Eighth Amendment claims. *See Matsushita*

*Elec. Indus. Co.*, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (quotation omitted). And absent an underlying constitutional violation, Jackson cannot prevail on his additional claims for failure to intervene and supervisory liability. For these reasons, as well as others identified above, this Court recommends that the defendants' motion for summary judgment be granted in its entirety and, consequently, that this action be dismissed with prejudice.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Defendants' Motion for Summary Judgment (Doc. No. 80) be **GRANTED**;

2.      This action be **DISMISSED WITH PREJUDICE** in its entirety; and

3.      Plaintiff Ronnie Jackson's Motion for Emergency Preliminary Injunction (Doc. No. 177) be **DENIED AS MOOT**.


Date:  January 28, 2016

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

**NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report by **February 12, 2016**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).